# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 84

APRIL TERM, A.D. 2015

June 11, 2015

GEORGE W. CLAY, IV and DANA CLAY, husband and wife; LOUIS OSWALD, III, Trustee of the Oswald Family Trust, dated April 27, 1998; JONATHAN S. RODERICK, Trustee of the Jonathan S. Roderick Living Trust, dated February 8, 2007; ALMA L. TISHER and KELLY B. TISHER, wife and husband; LINDA L. CONNELL; L-K-E INVESTMENTS, a Texas company; STEVEN A. TOFTE, successor Trustee of the Edwin A. Tofte Mineral Trust, dated July 31, 1995; JOE W. KING, Trustee for the Joe W. King Revocable Living Trust dated December 1, 1995; ROBERT L. OSTLUND; MARY SUE OSTLUND VAN NEWKIRK; POLLIE ANN OSTLUND MADDEN; WELFELT INTERESTS, LLC, a Texas company; McMAHON ENERGY PARTNERS, LIMITED PARTNERSHIP, a Colorado limited partnership; TOFTE ENERGY PARTNERS, LIMITED PARTNERSHIP, a Wyoming limited partnership; HESS CORPORATION, successor in interest to American Oil and Gas, Inc., a Colorado corporation; CONVERSE COUNTY LAND AND MINERALS, LLC, a Wyoming limited liability company; JOHN O. BULLINGTON; JOHN L. HOPPE, JR. and WARD F. HOPPE, as Co-Trustees of the John L. Hoppe Revocable Trust dated February 26, 1998 and PUMPKIN BUTTES, LLC, a Wyoming Company,

S-14-0197

Appellants
(Defendants),

v.

MOUNTAIN VALLEY MINERAL
LIMITED PARTNERSHIP,

Appellee
(Plaintiff).

*Appeal from the District Court of Converse County*
The Honorable Wade E. Waldrip, Judge

*Representing Appellants:*
Timothy M. Stubson and Jeff Oven of Crowley Fleck PLLP, Casper, Wyoming; James Edwards, Gillette, Wyoming; Harry B. Durham, III of Brown, Drew, Massey & Durham, Casper, Wyoming. Argument by Mr. Stubson and Mr. Edwards.

*Representing Appellee:*
Dan Riggs and Amanda K. Roberts of Lonabaugh & Riggs, LLP, Sheridan, Wyoming. Argument by Ms. Roberts.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice.**

[¶1]    Appellants George and Dana Clay, et. al (hereinafter referred to collectively as "the Clays") assert the district court erred by declaring Appellee Mountain Valley Mineral Limited Partnership (Mountain Valley) owned title to mineral interests in certain Converse County, Wyoming property.  The district court granted summary judgment in favor of Mountain Valley, concluding as a matter of law that its predecessor acquired title to the mineral interest in a 1976 quiet title action that was not contested by the Clays' predecessors.

[¶2]    We affirm.

## ISSUES

[¶3]    The Clays present the following issues on appeal:

> A. Whether the district court erroneously found that [the Clays] were barred under the doctrine of res judicata from litigating the issue of the [Clays'] respective mineral rights where the identity in subject matter and the issues were different from those adjudicated in 1976.
>
> B. Whether the district court erred by failing to address the [Clays'] argument that [Mountain Valley] [was] barred by the doctrine of laches from asserting its ownership interest in the entire estate.

Mountain Valley restates the issues as:

> A. Did the district court properly determine that [the Clays'] claims to the subject mineral estate were previously adjudicated by the unambiguous 1976 decree and are now barred by the doctrine of res judicata?
>
> B. Did the district court properly determine that laches does not apply in light of the 1976 decree?

## FACTS

[¶4]    In 1914 and 1915, the United States issued patents to Marcus and Frank Githens for property in Converse County, Wyoming, reserving only its interest in coal.  The

1

Githens conveyed one-fifth interests in the property to Henry Sidles, Charles Stuart, Alfred James, Jay Rice and Leslie Stire. Sidles and Stuart conveyed their interests to Jay Rice, giving him a 60% ownership interest. Rice died and his heirs took title to his interest as follows: Grace Rice – 30%; Jay Rice, Jr. – 15%; and Margaret Walters – 15%.

[¶5] In 1963, Jay Rice, Jr. conveyed one-half of his mineral interest (7.5% of the whole) to Walters. When Grace Rice died, she apparently left her interest in the property to Jay Rice, Jr. and Walters. In 1971, Jay Rice, Jr. conveyed an undivided "three tenths surface interest" in the subject lands together with all of his mineral interest to Walters, giving her a 60% interest in the property.

[¶6] The Stire 20% interest descended to Mary Stire and when she died in 1965, she left it to Ruby Shepherd for life with the remainder to William, Harold and John Hoppe. In 1974, the Hoppes conveyed their interest in the surface estate to Ruby Shepherd, giving her fee title instead of a life estate in 20% of the surface. The Hoppes reserved their remainder interest in the mineral estate. The James' 20% interest descended to family members.

[¶7] In 1974, Mountain Valley's predecessor Art and Hope Sims began to acquire record title to the surface of the property. They had apparently been grazing their sheep on it for some period of time prior to that. On May 16, 1974, Walters conveyed to the Sims "an undivided three-fifths interest" (60%) in the property, expressly reserving all of her mineral interest. On August 5, 1974, pursuant to a probate court decree, James conveyed to the Sims a one-fifth interest (20%) reserving the associated mineral interest, which was conveyed to Energetics, Inc. later in the year. On July 1, 1975, Shepherd conveyed to the Sims "an undivided one-fifth interest" (20%) in the property, but reserved her mineral interest. Thus, by 1975, the Sims had ostensibly acquired all of the surface interest in the property by deed. The owners of the mineral interest were: Walters – 60%; Shepherd/Hoppes – 20%; and Energetics – 20%.

[¶8] On May 14, 1976, the Sims filed a quiet title action against Rice, Walters, Stire, Shepherd, Stuart, Sidles, Githens, Hoppe, and any person claiming by, through or under them. Some of those named as defendants only owned mineral interests. The only interest owner not named in the action was Energetics. The Sims' complaint stated they were the owners in fee simple of the Converse County land, the defendants asserted some "right, title, interest in, or claim to, or lien or encumbrance upon the real property," and their right, title, or interest in the property was inferior to the plaintiffs. The complaint alleged that the Sims and their predecessors had paid all taxes against the real property "for more than ten (10) years last past" and had maintained "actual, open, visible, exclusive, continuous, adverse and notorious possession of said real property for more than ten years preceding the filing of this Complaint."

[¶9] The prayer for relief was broad:

2

1. That said Defendants be required to set forth their adverse claims to the premises hereinbefore described, and that the Court adjudge and decree that the title of the Plaintiffs in said real property is the full, free and valid fee simple ownership therein and that the Plaintiffs are entitled to possession of said real property.

2. That the Court adjudge and decree that the claims, titles and interests, if any, of said Defendants are subservient and inferior to the claims and title of Plaintiffs and have no force and effect.

3. That the Defendants be adjudged to have no right, title, estate or interest in, and lien or encumbrance in or upon said described real property or any portion thereof.

[¶10]  The district court entered a judgment and decree in favor of the Sims on October 7, 1976.  The judgment recited that the defendants had all been "duly served by publication according to law."  The district court stated that it had appointed an attorney to represent any of the defendants who were in military service and a guardian ad litem (GAL) to represent any defendants who were not competent to respond.  The attorney and GAL filed a general denial on behalf of the unknown defendants, but no other response to the complaint was filed.  All of the other defendants, which included the Clays' predecessors, failed to appear or answer the complaint's allegations.

[¶11]  The district court ruled in favor of the plaintiffs on all claims.  The judgment stated that default had been entered against all defendants except those represented by the attorney and GAL, a trial had been held on the claims against the defendants so represented, and the plaintiffs were entitled to judgment against all defendants.  The judgment included the following declarations:

1. That all and each of the Defendants have been lawfully notified of this action and that no additional notice be or need be given to any of the Defendants.

2. That the Defendants who have not answered Plaintiffs' Complaint or who have not otherwise appeared herein or defended pursuant to the Wyoming Rules of Civil Procedure, or otherwise, are in default herein and the Entry of Default heretofore entered is hereby confirmed.

3

3. That the Plaintiffs were at the time of filing their Complaint herein, and are now, the true and lawful owners and entitled to possession of the following described real property situate in Converse County, State of Wyoming: [legal description].

4. That the Plaintiffs have Judgment against the Defendants as prayed for in their Complaint and that Plaintiffs' title to and possession of the above-described real property be, and is hereby, declared good and valid, and quieted against any and all of the Defendants and persons claiming through, by or under the Defendants or any of them, and each and every adverse claim and demand of any of said Defendants or persons is hereby adjudged to be of no force and effect.

5. That each Defendant and their unknown heirs, devisees, executors, administrators, and assigns, or any other persons claiming by, through or under them, and each of them, is hereby adjudged to have no right, title, interest or estate whatsoever in or to said real property and is forever enjoined, barred and estopped from asserting any claim, right, title, interest or estate in or to said property or any part or parcel thereof.

Because Energetics was not named a defendant in the action, its 20% mineral interest was not affected in any way by the 1976 judgment.

[¶12] The record includes the first page of an unrecorded mineral lease for the property from the Sims to Exxon dated February 1977, just a few months after the October 1976 judgment.[1] Later, the Sims transferred their interest in the minerals to Mountain Valley, whose general partner is their daughter, Judy Hageman. Mountain Valley has also leased the minerals. Notwithstanding the 1976 judgment, the Clays' predecessors conveyed and/or leased the mineral interests. The Clays' mineral title derives from interests once held by Walters and Stire. Although no oil or gas wells have been drilled on the surface of the property, it has been included in pooling arrangements and spacing units so that mineral production has been attributed to the property at issue here.

---

[1] Although there was some discussion at oral argument about the Sims' possible reasons for filing the quiet title action given they had already acquired the entire surface of the property, neither party provided a definitive explanation. While it is speculation on our part, the fact that the Sims may have leased the minerals shortly after title was quieted in them suggests they may have filed the action to obtain record title to the mineral estate so it could be leased.

[¶13] Mountain Valley filed the present action for declaratory relief on May 15, 2013. Mountain Valley claimed to have title to 80% of the mineral interest in the property pursuant to the 1976 judgment and asserted the Clays were barred under the doctrine of res judicata from claiming any interest in the property. The only mineral interest owner not included as a defendant in this action was Energetics (or its successors) with a 20% mineral interest. The Clays responded by arguing the 1976 judgment did not affect the mineral interest because only the surface was at issue in that proceeding. The district court concluded that the 1976 action addressed the mineral interest; the judgment specifically granted fee simple title to the Sims; the judgment extinguished any adverse claims of the Clays' predecessors; and res judicata barred the Clays' current claim. The Clays appealed.

## STANDARD OF REVIEW

[¶14] Summary judgments are governed by W.R.C.P. 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We review a summary judgment *de novo*, using the same materials and following the same standards as the district court. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Hasvold v. Park County School Dist. No. 6,* 2002 WY 65, ¶ 11, 45 P.3d 635, 637-38 (Wyo. 2002), quoting *Four Nine Gold, Inc. v. 71 Constr., Inc.,* 809 P.2d 236, 238 (Wyo. 1991). *See also Baker v. Speaks,* 2014 WY 117, 334 P.3d 1215 (Wyo. 2014). We will affirm a summary judgment ruling on any legal ground appearing in the record. *Id.,* citing *Retz v. Siebrandt,* 2008 WY 44, ¶ 14, 181 P.3d 84, 90 (Wyo. 2008).

## DISCUSSION

### 1. Res Judicata

[¶15] This case presents the difficult legal question of how to give effect to a 1976 default judgment in a quiet title action and remain consistent with our law of adverse possession of mineral interests. We conclude, under the specific circumstances presented here, the default judgment quieted title to the mineral interest in Mountain Valley's predecessor, the Sims. The circumstances which warrant this decision include: the surface and mineral interests in a large percentage of the property were still consolidated

5

prior to 1974 when the Sims began acquiring the surface from various landowners who reserved their mineral interest; the Clays' predecessors were clearly named and properly served in the 1976 action and did not respond; the default judgment against them has not been set aside;[2] the original quiet title complaint properly set forth claims of quiet title and adverse possession; and the judgment was phrased in broad terms granting the Sims all right and title in the property while declaring that the Clays' predecessors had no right, title, interest or estate "whatsoever" in the property.

[¶16]  The district court ruled that the Clays were barred by res judicata from contesting Mountain Valley's title to the mineral interests.  It concluded the 1976 judgment effectively quieted title in "fee simple" to the property, which included the mineral interest, against all of the named defendants and their successors.  The elements of res judicata are:

> 1) the parties must be identical; 2) the subject matter must be identical; 3) the issues must be identical and relate to the same subject matter; and 4) the capacities of the persons must be identical in reference to both the subject matter and the issues between them.

*Wyo. Med. Center, Inc. v. Wyo. Ins. Guar. Ass'n,* 2010 WY 21, ¶ 15, 225 P.3d 1061, 1065 (Wyo. 2010), citing *CJ v. SA,* 2006 WY 49, ¶ 11, 132 P.3d 196, 202 (Wyo. 2006).

[¶17]  Starting with the first element, parties are considered identical for application of res judicata when they are "the same as, or in privity with, those involved in previous proceedings."  *Grynberg v. L & R Exploration Venture,* 2011 WY 134, ¶ 23, 261 P.3d 731, 737 (Wyo. 2011), citing *Osborn v. Kilts,* 2006 WY 142, ¶ 10, 145 P.3d 1264, 1267 (Wyo. 2006).  The Clays' interests derive from Walters and Stire, who were defendants in the 1976 proceeding, and Mountain Valley acquired its interest from the original plaintiffs, the Sims.  There is no question that the parties in this case are identical under principles of privity with parties involved in the 1976 proceeding.

[¶18]  The Clays assert, however, that the subject matter and issues involved in this declaratory judgment action are different from those resolved in the 1976 proceeding.  The heart of their argument is that the 1976 decree pertained only to the surface estate and, therefore, the preclusive effect of the decree extends only to that estate and not to the mineral estate.

[¶19]  In 1976, the defendants defaulted by failing to respond to the Sims' quiet title complaint and the court entered judgment against them.

---

[2]  The district court analyzed whether the default judgment should be set aside under W.R.C.P. 60(b) and concluded it should not.  The Clays do not contest that decision on appeal .

6

"[A] party who suffers judgment by default in effect confesses the truth of the facts respecting the claim except for facts that in their nature require an examination of details, as, for example, the amount of damages when the claim is unliquidated. If he later wishes to draw in issue the facts thus confessed, he must move in the trial court to set aside the judgment; he cannot draw in issue the facts by appealing directly from the default judgment, because on the record they stand confessed.

*Spitzer v. Spitzer,* 777 P.2d 587, 589-90 (Wyo. 1989), quoting 9 J. Moore, B. Ward & J. Lucas, *Moore's Federal Practice* ¶ 203.06 at 3-27 to 3-28 (2d ed. 1989) (emphasis omitted). *See also* 46 Am. Jur. 2d *Judgments* § 305 ("A default has been held to operate as an admission of the truth of all the material allegations set forth in the complaint or declaration. A default has also been held to operate as an admission of the cause of action, so as to be tantamount to an admission that the plaintiff is entitled to judgment.") (footnotes omitted). The Sims' default judgment has not been set aside and is, therefore, still fully valid.

[¶20] The Sims' complaint followed Wyo. Stat. Ann. § 1-32-201 (LexisNexis 2013), which governs quiet title actions:

An action may be brought by a person in possession of real property against any person who claims an estate or interest therein adverse to him, for the purpose of determining the adverse estate or interest. The person bringing the action may hold possession himself or by his tenant.

As we explained in *Barrett v. Town of Guernsey,* 652 P.2d 395, 399 (Wyo. 1982),

The purpose for which a statutory action to quiet title is brought is to determine adverse claims to real property to secure repose and put at rest in one comprehensive action all adverse and conflicting claims, to fix the status of the land with respect to ownership and to establish by decree a muniment of title to it. 74 C.J.S., Quieting Title § 6, pp. 16–17.

In order to accomplish the purposes of an action to quiet title, there must be some means whereby the finality sought is real and has the stability intended.

7

[¶21]   The Sims sought quiet title of the real property based upon the doctrine of adverse possession.  The Clays assert the Sims' adverse possession claim was limited to the surface estate because they could not, as a matter of law, have maintained a claim for adverse possession of the severed mineral estate without establishing that they produced minerals from the property.  The general law on adverse possession states, "'[i]n order to establish adverse possession, the claiming party must show actual, open, notorious, exclusive and continuous possession of another's property which is hostile and under claim of right or color of title.'  Possession must be for the statutory period, ten years." *Addison v. Dallarosa–Handrich,* 2007 WY 110, ¶ 11, 161 P.3d 1089, 1091 (Wyo. 2007), quoting *Gillett v. White,* 2007 WY 44, ¶ 15, 153 P.3d 911, 915 (Wyo. 2007).

[¶22]   Both the mineral estate and the surface estate may be adversely possessed.  *State ex rel. Cross v. Bd. of Land Comm'rs,* 50 Wyo. 181, 198-99, 58 P.2d 423, 429 (1936). The difference between claims for adverse possession of the surface and mineral estates is the method of proving the possession element.  In *Cross*, we quoted with favor the Supreme Court of Illinois in *Kinder v. La Salle County Carbon Coal Co.*, 301 Ill. 362, 133 N.E. 772, 773 (1921), as follows:

> Coal, limestone, and other minerals in place are land and are attended with all the attributes and incidents peculiar to the ownership of land. Title to minerals, distinct from title to surface of land, may be proven in exactly the same way as title to the surface. *Catlin Coal Co. v. Lloyd,* 176 Ill. 275, 52 N.E. 144. <u>Title to the mineral stratum may therefore be shown by proof of adverse possession, but the difficulty with respect to getting title of such an estate by adverse possession is found in the difficulty of getting and proving actual possession.</u> By a severance separate estates are created which are held by separate and distinct titles, and each estate is incapable of possession by the mere occupancy of the other. *Renfro v. Hanon*, 297 Ill. 353, 130 N.E. 740; 2 Corpus Juris, 71; 1 R.C.L. 738."

*Id.* (emphasis added).

[¶23] As we noted in *Cross,* proof of possession of the surface does not establish possession of a severed mineral estate.  In order to prove the "possession" element of an adverse possession claim on a mineral estate after the surface and mineral estates have been severed, actual possession of the minerals (as distinguished from possession of the surface) is required.  A claimant must establish that he specifically possessed the minerals by engaging in some type of mining operation.  Thus, without mineral production a claimant cannot satisfy the elements of the adverse possession of a severed mineral

8

estate. *Ohio Oil Co. v. Wyo. Agency,* 63 Wyo. 187, 206, 179 P.2d 773, 779 (1947); *Roush v. Roush,* 589 P.2d 841, 843 (Wyo. 1979).

[¶24] However, prior to severance of the minerals, adverse possession of the surface will include the mineral estate. *See id.; See also Cross* 58 P.2d at 429. Furthermore, and of great importance in this case, a severance of the mineral estate by one partial interest owner of a property does not affect the consolidation of the mineral and surface interests with respect to the other owners. *Town of Glenrock v. Abadie,* 71 Wyo. 414, 426-27, 259 P.2d 766, 769-70 (1953). *See also* 40 RMMLF-INST Chap. 21, p. 12 (1994) ("If only a fractional undivided mineral interest has been severed from the surface, however, then the adverse possessor of the surface can also acquire title to the unsevered part of the mineral interest through his occupation of the surface.") It appears the parties, and perhaps the district court, assumed that severance of the property's entire mineral estate occurred when Jay Rice, Jr. conveyed one-half of his mineral interest (7.5% of the whole) to Walters in 1963. However, under *Abadie,* the remainder of the mineral estate (92.5% of the whole) stayed consolidated with the surface until the record title owners conveyed the surface to the Sims and reserved the minerals in 1974 and 1975.

[¶25] The paragraph in the 1976 complaint setting forth the Sims' adverse possession claim stated:

> 5. That Plaintiffs and their predecessors in interest have paid all taxes legally assessed against said real property for more than ten (10) years last past, and have been in actual, open, visible, exclusive, continuous, adverse and notorious possession of said real property for more than ten (10) years preceding the filing of this Complaint.

[¶26] The Clays assert the Sims only claimed to have adversely possessed the surface and, therefore, they could not acquire the mineral estate in the 1976 quiet title action. That is not an accurate reading of the Sims' adverse possession allegation. They claimed to have possessed the "real property." Both mineral and surface estates are "real property" under our law. Although the complaint did not make any specific allegation about the nature of their adverse claim or the particulars of their means of possessing the property, the Sims included defendants who only owned mineral interests at that time.

[¶27] The complaint also did not set forth a specific date that the Sims' claim of adverse possession commenced. It simply said the Sims had adversely possessed the real property for more than ten years. Given the defendants defaulted, the allegations in the complaint were admitted, including that the Sims had possessed the property for more than the requisite ten year period. An argument could be made that the defendants reasserted their claims of ownership over the mineral estate prior to the 1976 quiet title action when they deeded their surface interests to the Sims and reserved the minerals,

9

thereby ceasing any period of adverse possession. We have, in two recent cases, acknowledged that a claimant may establish adverse possession of property even though the period of adverse possession has ceased. In *Graybill v. Lampman,* 2014 WY 100, ¶ 35, 332 P.3d 511, 521 (Wyo. 2014), we noted that the Graybills' predecessors had adversely possessed the property decades earlier even though the Lampmans reasserted ownership before the Graybills filed their quiet title action. In *Ruby River Canyon Ranch, LTD v. Flynn,* 2015 WY 74, ¶¶ 11-14, ___ P.3d ___ (Wyo. 2015), we considered the evidence of the claimant's alleged possession of the property for a time period prior to when the record owner granted the claimant express permission to use the property.

[¶28] The Clays' predecessors did not appear at all to contest the Sims' allegations of adverse possession or to otherwise object to the Sims' request that all right, title and interest in the property be set over to them and that defendants be dispossessed of any interest they had "whatsoever" in the property. So, unlike the claimants in *Ohio Oil* and *Roush,* the Sims were never put to their proof on the possession element of adverse possession of the surface or the minerals.

[¶29] Once we recognize that (1) 92.5% of the mineral and surface estate was consolidated until just two years before the quiet title action was filed making that portion of the mineral estate subject to adverse possession without proving mineral production; and (2) a claimant may establish adverse possession by showing possession of the property during any earlier 10 year period, the basic premise of the Clays' argument falls apart. It is simply not true that the Sims were unable, as a matter of law, to adversely possess the mineral estate because they could not show mineral production from the property.

[¶30] With regard to the 7.5% mineral interest severed by Jay Rice, Jr. in 1963, if the case were contested the Sims would have been required to show mineral operations or that they had adversely possessed the property for the requisite time prior to severance. However, Walters (who owned the interest at the time of the 1976 action) did not answer or otherwise respond to the Sims' quiet title complaint.[3] Regardless of the underlying facts of the Sims' adverse possession of that interest, the broad language of the default

---

[3] An argument could be made that the previously severed minerals merged with the surface estate when the ownership of both estates reunited in Walters in 1971. That is what happens when a dominant interest merges with a servient interest, such as in the case of the merger of an easement and the surface estate in a single owner. "When one party acquires a fee title to both the servient and dominant estates, the easement merges into the interest of the servient estate and terminates." *Davidson Land Co, LLC v. Davidson,* 2011 WY 29, ¶ 31, 247 P.3d 67, 75 (Wyo. 2011). However, there apparently is a split of legal authority on whether a merger takes place when the surface and mineral interest are reunited in a single owner because the estates are of equal rank. *See, e.g.*, *Medicine Lodge Investments, LLC v. EAR, Inc.,* 197 P.3d 502, 509, n.13 (Okla. Ct. App. 2008). We need not decide this legal issue in the present case.

judgment confirms that title to the surface and 80% of the minerals, including the severed 7.5% interest, was quieted in favor of the Sims in 1976. Courts employ basic rules of contract interpretation in determining the res judicata effect of a judgment.

> The legal operation and effect of a judgment must be ascertained by a construction and interpretation of its terms, and this presents a question of law for the court. Courts interpret judgments by the same rules of construction as other written instruments, and the intention of the trial court must be determined. That is, if there is uncertainty and ambiguity in a judgment, the reviewing court must construe it so as to express the intent of the trial judge. A judgment is ambiguous when it would lead two reasonable persons to different conclusions as to its effect and meaning.
>
> *Necessity of ambiguity in judgment.*
> If the language used in a judgment is ambiguous there is room for construction. A judgment is ambiguous if it is capable of more than one reasonable interpretation. However, if the language employed is plain and unambiguous there is no room for construction or interpretation, and the effect thereof must be declared in the light of the literal meaning of the language used. That is, an unambiguous judgment must be enforced according to its terms.

50 C.J.S. *Judgments* § 741 (2015) (footnotes omitted). *See also* 46 Am. Jur. 2d *Judgments* § 74 (2015) (stating that as "a general rule, judgments are to be construed like other written instruments, and the legal effect of a judgment must be declared in light of the literal meaning of the language used").

[¶31] The quoted provisions of the 1976 decree in Paragraph 11, above, are very broad granting the Sims all interest in the property, adjudging the defendants to have no right, title, interest or estate "whatsoever" in or to said real property and declaring that the defendants were "forever enjoined, barred and estopped from asserting any claim, right, title, interest, or estate or to said property or any part or parcel thereof." The plain meaning of this language is that the Sims obtained all interest in the property and the defendants were adjudged to have no interest in the property. Both the surface and minerals fall within the definition of right, title, interest and estate of the property.

[¶32] The Clays also claim that use of the term "fee simple" in the 1976 action is consistent with a holding that the Sims acquired the surface interest only. The Sims' complaint referred to a fee simple interest but it did not specify the surface estate. The 1976 decree did not actually contain the term "fee simple," but it did grant judgment in

accordance with the prayer in the Sims' complaint which requested the district court "adjudge and decree that the title of the Plaintiffs in said real property is the full, free and valid fee simple ownership."

[¶33] The term "fee simple" does not go far to help resolve the issues in this case. "Fee simple" just means an estate that can be inherited and is not subject to conditions or "collateral determination." *Cross,* 50 Wyo. at 201, 58 P.2d at 430. A fee simple estate may be owned in the entire property before the minerals are severed or in the surface and/or the mineral estates after severance. *Id.* at 430-31. *See also Evanston v. Robinson,* 702 P.2d 1283, 1289 (Wyo. 1985); *Williams v. Watt,* 668 P.2d 620, 624-25 (Wyo. 1983). Thus, a ruling that a party owns a fee simple interest in a property, by itself, does not determine whether that interest is in the mineral estate, the surface estate, or both. We, therefore, reject the Clays' argument that the 1976 action was limited to fee simple ownership of the surface.

[¶34] The Oklahoma Supreme Court addressed a factual scenario similar to the present case in *Crain v. Farmers United Cooperative Pool,* 472 P.2d 882 (Okla. 1970). In 1941, Crain filed a quiet title action, generally alleging that she was the owner in fee simple of a property and that numerous defendants, including Farmers, claimed an interest adverse to hers. Crain recited the elements of a quiet title action without specifically alleging the origin or basis of her adverse claim or that the mineral estate was included in her claim; however, she named parties who only owned mineral interests as defendants. Farmers owned a mineral interest and was named as a defendant but did not respond to the action. After it defaulted, the trial court entered judgment quieting Crain's title against any adverse claim of Farmers and the other defendants. *Crain,* 472 P.2d at 883.

[¶35] In 1965, Crain commenced a second quiet title action on the same property, again naming Farmers as a defendant. Farmers cross-petitioned asserting it had a paramount interest in the mineral estate. The Oklahoma Supreme Court ruled that the 1941 petition stated a sufficient cause of action to quiet title in the mineral estate even though Crain's claim against the mineral estate was not specified in the complaint; therefore, the judgment rendered in the earlier proceeding was not subject to collateral attack by Farmers. The court summarized its decision as follows:

> We hold that the 1941 judgment rendered on a petition alleging that Crain was the fee simple owner and in possession of property, describing it, and that Farmers claimed some unspecified adverse interest constituting a cloud upon Crain's title, stated a cause of action. Farmers was properly before the court by virtue of personal service of summons. Farmers was, therefore, obligated to interpose the asserted paramount mineral interest in that action. Farmers

12

declined, and the 1941 judgment rendered on behalf of Crain is valid.

*Id.* at 883-84.[4]

[¶36] There is no relevant distinction between *Crain* and the instant case, and we agree with the Oklahoma court's resolution. Similarly, in *Burch v. Hibernia Bank,* 304 P.2d 212 (Cal. Ct. App. 1956), a California court of appeals held a default judgment in an earlier quiet title action was not subject to collateral attack in a later action even though the defendants may have had superior title to the property prior to the first action. The defaulting defendant had notice of the judgment that would be taken against him if he did not respond, and his failure to protect his interests in the first action could not be remedied in a later action. A default judgment in a quiet title action is, therefore, entitled to res judicata effect in subsequent actions. *Id.; See also Golden Cycle Corp. v. Cresson Consolidated Gold Mining & Milling Co.,* 497 P.2d 714 (Colo. Ct. App. 1972); *Doctrine of Res Judicata as Applied to Judgments by Default,* 128 A.L.R. 472 (1940, updated 2015).

[¶37] The Clays insist that if the district court's decision in this case is upheld, it puts every owner of a mineral interest in property that has been subject to an adverse possession action at risk of losing its interest. We do not share that concern because the result in this case is driven by the specific circumstances. Those circumstances include that the surface and minerals were consolidated as to most of the property until the Sims acquired ownership of the surface so that adverse possession of the surface also included the mineral estate. The Sims named all of the interest owners (with the exception of one 20% mineral interest owner) as defendants in the 1976 action, thereby giving them an opportunity to contest the claim. The complaint did not limit the action to the surface estate but clearly stated that it was intended to adjudicate any and all interests each defendant had in the property and sought a judgment that the defendants had "no right, title, estate or interest in . . . said described real property or any portion thereof." The complaint stated a general quiet title action and recited the elements of adverse possession without delineating that it only pertained to the surface estate. The defendants (the Clays' predecessors) wholly failed to respond, so the Sims were not put to their proof with regard to the possession element of their adverse possession claim on either the surface or the mineral estate. The 1976 judgment specifically stated the defendants had lost any interest they had "whatsoever" in the property, and the judgment has not been set aside.

---

[4] Like Wyoming, Oklahoma requires evidence of actual mineral operations on the surface to prove a claim of adverse possession of a mineral estate. *Cornelius v. Moody Bible Institute,* 18 P.3d 1081, 1084 (Okla. Ct. App. 2000).

13

[¶38] Under these circumstances, the 1976 action and the present action involve identical subject matters and issues and the parties' relationship to the subject matter and issues is the same. All of the elements of res judicata were satisfied, and the district court properly ruled that the Clays were barred from asserting they owned the mineral interest.

## 2. Laches

[¶39] The district court declined to address the Clays' laches defense after it concluded the 1976 decree was valid. The Clays assert that their laches defense is still viable because Mountain Valley delayed in asserting its right to the mineral interest until it became valuable.

[¶40] We have held that the equitable doctrine of laches may apply to bar a claim to a mineral interest under appropriate circumstances.

> Laches bars a claim when a party has delayed in enforcing its rights to the disadvantage of another. *Dorsett v. Moore,* 2003 WY 7, ¶ 9, 61 P.3d 1221, 1224 (Wyo.2003). "The defense of laches is based in equity and whether it applies in a given case depends upon the circumstances." *Ultra Resources, Inc. v. Hartman,* 2010 WY 36, ¶ 123, 226 P.3d 889, 929 (Wyo.2010). Two elements must be proven to establish laches: 1) inexcusable delay; and 2) injury, prejudice, or disadvantage to the defendants or others. *Moncrief v. Sohio Petroleum Co.,* 775 P.2d 1021, 1025 (Wyo.1989).

*Windsor Energy Group, LLC v. Noble Energy, Inc.,* 2014 WY 96, ¶ 12, 330 P.3d 285, 288-89 (Wyo. 2014).

[¶41] In *Windsor,* ¶ 20, 330 P.3d at 290-91, the plaintiffs had inexcusably delayed in asserting their contractual right to recover the costs of production on oil and gas leases and were, therefore, barred by the doctrine of laches from asserting those rights several years later. Similarly, Moncrief delayed in seeking specific performance of its right to assignment of an oil and gas lease interest until after the lease became valuable. We concluded the doctrine of laches applied because of Moncrief's dilatory conduct. *Moncrief,* 775 P.2d at 1026-28.

[¶42] The present dispute does not present an appropriate case for the application of laches. Mountain View did not delay in asserting a right to the mineral interest. Its predecessors, the Sims, moved to protect and/or establish their interest by filing the quiet title action in 1976 and obtained a judgment declaring them the owners of the property in all respects except the 20% interest owned by Energetics. Thus, Mountain Valley had

already acquired its interest and did not need to take further action to avoid the equitable doctrine of laches.[5]

[¶43] Affirmed.

---

[5] The Clays also asserted in the district court that they had acquired the mineral interest by adverse possession after the 1976 judgment. They claimed to have adversely possessed the mineral interest by leasing it and receiving payment, under various pooling agreements, for minerals produced from the disputed interests. The district court denied their adverse possession claim and they do not argue on appeal it erred in that regard.